

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00313-CR

David **GREENWOOD**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Wilson County, Texas
Trial Court No. CRW1707142
Honorable Lynn Ellison, Judge Presiding

Opinion by:　Luz Elena D. Chapa, Justice

Sitting:　　　Patricia O. Alvarez, Justice
　　　　　　　Luz Elena D. Chapa, Justice
　　　　　　　Lori I. Valenzuela, Justice

Delivered and Filed: March 8, 2023

AFFIRMED

Appellant David Greenwood appeals his judgment of conviction for murder with an affirmative finding of a deadly weapon. In one issue, Greenwood argues the evidence is insufficient to support his conviction because he proved he acted in self-defense. We affirm.

### BACKGROUND

Greenwood, his mother Winifred Gates, and his late-older brother Alexander Clay Byrom lived on rural property near La Vernia, Texas. Gates and Byrom—who had relocated to the residence only three weeks earlier—lived in the house on the property, and Greenwood lived in a

shed-like apartment on the property behind the house. On May 5, 2017, Greenwood got into an argument with his girlfriend on the property. During the argument, Greenwood shoved his girlfriend to the ground in the large area of the property between the house and the apartment. Greenwood's mother and Byrom observed the incident from the house, and Greenwood's mother brought Greenwood's girlfriend into the house. Byrom—who had assaulted his brother in the past in connection with an alleged affair with Byrom's wife—became visibly upset over Greenwood's action against his girlfriend. Byrom exited the house onto the back patio and got into a heated verbal exchange with Greenwood. During the exchange, Byrom began telling Greenwood "Shoot me. Shoot me." It was around this time Greenwood shot Byrom once in the chest resulting in his death.

The State charged Greenwood with murder, and Greenwood pleaded not guilty. The case proceeded to a jury trial, and the jury found Greenwood guilty and sentenced him to twenty years in prison.

Greenwood timely filed a notice of appeal.

## SELF-DEFENSE

Greenwood's sole contention is the evidence was insufficient to support his murder conviction because the evidence presented at trial showed "the jury was irrational" for rejecting his self-defense claim.

### A. Self-Defense

A person commits murder if the person "(1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life causing the death of an individual;" or (3) commits or attempts to commit a felony (not manslaughter), and in the course of and in furtherance thereof, commits or attempts to commit an

act clearly dangerous to human life causing the death of an individual. TEX. PENAL CODE § 19.02(b).

To prevail on a self-defense claim involving the use of deadly force, a defendant must prove: (1) he would have been justified in using force against another under Texas Penal Code section 9.31;[1] and (2) "when and to the degree [the defendant] reasonably believes the deadly force is immediately necessary: (A) to protect the [defendant] against the other's use or attempted use of unlawful deadly force," or (B) to prevent the other from imminently committing "aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." TEX. PENAL CODE § 9.32(a). A defendant's belief the deadly force was immediately necessary is presumed reasonable if the defendant; (1) "knew or had reason to believe that the person against whom the deadly force was used" was committing or attempting to commit one of several enumerated serious felony offenses; (2) did not provoke the person against whom the force was used; and (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor traffic violation. *Id.* § 9.32(b).

**B. Sufficiency of the Evidence in Self-Defense Cases**

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). "In assessing the sufficiency of the evidence to support a criminal conviction, 'we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a

---

[1] Section 9.31(a) provides "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE § 9.31(a).

reasonable doubt.'" *Id.* at 607-08 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"This familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Id.* at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). This court "determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Id.* (quoting *Adames*, 353 S.W.3d at 860) (internal quotation marks omitted). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.* This court "may not reevaluate the weight and credibility of the evidence in the record and thereby substitute [its] own judgment for that of the factfinder." *Id.* "A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'" *Id.* (quoting *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "Although the parties may disagree about the logical inferences that flow from undisputed facts, [w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.* (alteration in original) (quoting *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006)) (internal quotation marks omitted). "However, juries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 15-16).

When a defendant claims self-defense, "the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Id.* "The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue." *Id.* "By contrast, the State's burden of persuasion 'is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt.'" *Id.* (quoting *Zuliani v. State*, 97 S.W.3d

589, 594 (Tex. Crim. App. 2003)). "Thus, '[i]n resolving the sufficiency of the evidence issue," this court must "look not to whether the State presented evidence which refuted appellant's self-defense testimony"; instead it must "determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.'" *Id.* at 609 (alterations in original) (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)); *see, e.g.*, *Capetillo v. State*, No. 04-19-00025-CR, 2020 WL 5802959, at *4 (Tex. App.—San Antonio Sept. 30, 2020, pet. ref'd) (mem. op., not designated for publication).

Self-defense "is an issue of fact to be determined by the jury," and "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Braughton*, 569 S.W.3d at 609 (alteration in original) (quoting *Saxton*, 804 S.W.2d at 914) (internal quotation marks omitted); *see, e.g.*, *Chase v. State*, No. 04-17-00834-CR, 2019 WL 2360091, at *3 (Tex. App.—San Antonio June 5, 2019, no pet.) (mem. op., not designated for publication). "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Braughton*, 569 S.W.3d at 609 (quoting *Saxton*, 804 S.W.2d at 914) (internal quotation marks omitted).

### C. The Evidence

The undisputed evidence shows in 2015, Byrom came to believe his wife had an extramarital affair with Greenwood. Byrom responded by breaking down Greenwood's apartment door with a sledgehammer and assaulting Greenwood, injuring him. The evidence shows Byrom

also physically attacked Greenwood at a party. Byrom also began to struggle with substance abuse around this time.

Gates, whom the State called, testified that Byrom moved into the house in 2017 three weeks before he was shot by Greenwood.[2] Greenwood testified when he learned Byrom had moved into the house, he believed something would happen between them, and he feared for his life after the sledgehammer incident. Gates and Greenwood both testified Byrom could see Greenwood's apartment from the house, and Byrom would sit and stare at it. They also testified Byrom would pace the property between the house and the apartment, attempting to taunt Greenwood. Gates testified, despite Byrom's actions, Byrom and Greenwood did not actually interact except occasionally shouting at each other from across the property. She further testified she and Byrom had used heroin on the property.

Gates testified that on the night of the shooting Byrom became agitated after he witnessed Greenwood shove his girlfriend to the ground.[3] Gates testified Byrom hated Greenwood; he tried to get outside the house to get to Greenwood; she tried to calm Byrom down. She further testified Byrom eventually exited the house onto the back patio, and she stood in front of him and tried to stop him. Gates testified she was scared for Greenwood's life because of the incidents where she had seen Byrom severely hurt Greenwood. She further testified Greenwood feared Byrom.

Greenwood testified, after he shoved his girlfriend to the ground, he went back into his apartment to calm down and stayed there for ten to twenty minutes. He testified during this time Byrom was staring at him from the back patio. Greenwood testified he then began to walk toward the house, but away from the back patio and toward the garage driveway. He also testified he heard

---

[2] Gates testified Byrom had been living at Haven for Hope but was no longer allowed to remain there after getting into a fight.

[3] Greenwood's girlfriend did not testify at trial.

Byrom yelling and screaming, "I'm going to get him. I'm going to get him. This is it. This is it," while Gates was trying to calm Byrom. Greenwood testified that he started yelling in Byrom's direction that he was just going to get his girlfriend, who was inside the house, and "take her home. That's all I want to do." He further testified Byrom went inside the house, then came outside "acting crazy," and then returned to the house. Greenwood testified he was "just kind of still slowly walking toward the house a little bit, because I was already getting pretty close to the house." He testified he was uncertain as to whether Byrom would confront him. He further testified Byrom came back outside screaming, and they made eye contact. Greenwood testified he saw a "look" in Byrom's eyes telling him Byrom was "going to come at [him] now." Greenwood further testified he then pulled a .25 caliber semiautomatic pistol from his back pocket, and Byrom started moving toward him.[4]

Both Greenwood and Gates testified Byrom eventually began telling Greenwood, "Shoot me. Shoot me." Greenwood testified he then fired some warning shots to get Byrom to stop. Greenwood further testified when he fired his first few warning shots, he was no more than ten feet from the back patio. He testified Byrom continued coming at him, so he shot toward the ground again.

The undisputed evidence shows Greenwood then shot Byrom in the chest. Greenwood initially testified he was retreating from the house when he turned and shot a "blind shot" after his warning shot, explaining he "wasn't even really trying to aim, and, you know, it hit him." However, Greenwood conceded on cross-examination he told investigators he intentionally fired the shot to hit one of Byrom's lower extremities and testified that had been his actual intent. Greenwood affirmed during cross-examination that after he began firing the pistol, he knew it misfired. He

---

[4] Gates also testified she saw Byrom move toward Greenwood, but later admitted she did not actually witness it.

further testified he had to physically pull the slide back to eject shell casings to fire a new bullet. When questioned how he was able to fire four shots at Byrom at a "short distance" while Byrom moved toward him when the pistol kept jamming, he explained the pistol was small and he had quick hands.

Greenwood testified Byrom was unarmed when he shot him. When asked whether Byrom had any weapons in hand when he was shot, Gates did not directly answer the question, testifying Byrom had a knife in his back pocket. After being confronted with her statement to the Texas Rangers stating Byrom was unarmed, she reiterated he had had a knife in his back pocket that was found "under the car" near the back patio. Chief Deputy Johnie Deagen of the Wilson County Sheriff's Office testified investigators found no knives on Byrom or near him.[5]

Gates testified after Greenwood shot Byrom, Byrom came to the back door and told Gates he had been shot and then collapsed to the ground. Greenwood and Gates testified Greenwood attempted CPR on Byrom, but Gates conceded during her testimony she did not tell this to law enforcement investigators interviewing her. Greenwood said it was clear to him, after performing CPR, Byrom was dead. Greenwood and Gates both testified Gates told Greenwood to leave the property. Greenwood, along with his girlfriend, fled the property and was apprehended a short time later in Blanco County by a state trooper. Gates testified when she spoke with investigators she told them she was not certain, but she thought Greenwood was "messed up." Greenwood testified he abused marijuana and used methamphetamines, but he had not used either drug that day.

Chief Deputy Deagen testified investigators located two .25 caliber live rounds and two .25 caliber spent shell casings fired by a pistol in the "backyard area" between the house, the

---

[5] The undisputed evidence shows another knife, which Byrom used for killing snakes, was on the back patio more than ten feet from where Byrom's body was found.

apartment, and a carport structure. He also testified the live rounds and the other spent shell casing were not found at the same location, agreeing it was possible Greenwood did not fire shots from a single location, but was moving. Texas Ranger Shane Staley testified one of the spent shell casings was located 69.65 feet from the back patio where Byrom's body was found.

Mallory Foster—a Texas Department of Public Safety forensic scientist working in the firearms and tool marks section—testified she attempted to test fire the pistol unsuccessfully. When she pulled the trigger, the pistol would eject the live rounds, denting the bullet's primer but not actually firing the bullet because of a defective spring.[6] Foster also testified that after attempting to fire a bullet from the pistol, any attempt to fire the pistol again would have required the gunman to manually pull the metal slide at the top of the pistol back to eject the previous bullet's cartridge. She further testified the dent made in the bullet's primer was consistent with the dent made in the primer of the live rounds turned over to her in evidence with the pistol. Her Firearms & Toolmarks Laboratory Report, which was admitted as evidence without objection, further provided the spent shell casings were also fired from the pistol.

Ranger Staley testified Greenwood told him during his interview he had been angry before he shot Byrom, and Byrom did not deserve to be shot. It was during this testimony the State also played a jail house phone call during which Greenwood told his father he did not know what he was thinking and to tell everyone he was sorry. Greenwood testified, when questioned why he did not mention he was acting in self-defense, he simply did not provide a detailed summary of the incident to his father. He also testified he told investigators Byrom "came at [him] and [he] had to defend himself."

---

[6] Foster testified when a bullet's primer is struck by a gun's firing pin, the primer ignites the gun powder and causes the gun to fire the bullet.

**D. Analysis**

Greenwood concedes "there is sufficient evidence in the record for the jury to have found the essential elements of murder beyond a reasonable doubt," but argues "the jury should have nevertheless found that [he] acted in self-defense so as to justify his use of deadly force against [Byrom]." However, "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id.* (alteration in original). Nevertheless, Greenwood argues his testimony, and his witnesses' and the prosecution's witnesses' testimony prove he acted in self-defense.

Turning to the evidence of self-defense, it is undisputed Byrom did not wield a deadly weapon like Greenwood or otherwise use or attempt to use unlawful deadly force against Greenwood.[7] *See* TEX. PENAL CODE § 9.32(a); *Braughton*, 569 S.W.3d at 607-08. Nor was there any evidence Byrom was committing an aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *See* TEX. PENAL CODE § 9.32(a); *Braughton*, 569 S.W.3d at 607-08. And, the jury could not presume Greenwood's actions were reasonable for the purposes of self-defense because there was no evidence Byrom forcibly entered Greenwood's home, vehicle, or place of business or employment, or forcibly removed Greenwood from one of those locations. *See* TEX. PENAL CODE § 9.32(b); *Braughton*, 569 S.W.3d at 607-08. Moreover, the jury could have reasonably credited Greenwood's own testimony he was angry when he shot Byrom, and he intended to shoot Byrom in one of his lower extremities therefore intending to cause serious bodily injury and commit an act clearly dangerous to human life.[8]

---

[7] Gates testified Byrom had a pocketknife on him when he was shot that was later found under the car near the back patio. However, the jury was entitled to credit the testimony of Greenwood and Chief Deputy Deagan that Byrom was unarmed and had no weapons near him. *See Braughton*, 569 S.W.3d at 608; *see also, e.g.*, *Ramirez v. State*, No. 04-19-00074-CR, 2020 WL 214776, at *4 (Tex. App.—San Antonio Jan. 15, 2020, no pet.) (mem. op., not designated for publication).

[8] The jury could have further drawn an inference of guilt based on the evidence at trial showing Greenwood fled the scene and initially disposed of the murder weapon in a location he only later disclosed to authorities. *See, e.g.*, *Chase*, 2019 WL 2360091, at *4 (citing *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (recognizing "factfinder may draw an inference of guilt from the circumstance of flight")).

Greenwood's main argument is he reasonably believed deadly force was immediately necessary because (1) Byrom's history of violence against him made him fear for his life and (2) Byrom moved in his direction. However, Greenwood's history with Byrom and his claim he feared for his life are based entirely on the jury crediting the testimony of certain witnesses, and this court must defer to the jury's credibility assessment and the weight the jury gave such testimony. *See Braughton*, 569 S.W.3d at 608, 613 ("We cannot substitute our own view of these witnesses' credibility based on a cold record for that of the factfinder."). Moreover, even if the jury credited such testimony, the jury could have reasonably inferred from the cumulative force of the evidence Greenwood was much farther away from Byrom than Greenwood claimed because one spent shell casing was located nearly seventy feet away from the back patio where Byrom's body was found. *See id.* at 608, 609 ("Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence."). Based on Greenwood's testimony that his initial shots were fired from no more than ten feet away, the jury could have also reasonably inferred the spent shell casing nearly seventy feet away was the fatal shot and Byrom was no longer a threat to Greenwood at that distance justifying Greenwood's deadly use of force. *See id.* at 609, 612 ("The jury was free to evaluate Gina's testimony and disregard mistakes or inconsistencies while crediting other portions of her testimony.").

The record does not indicate the jury was irrational in rejecting the defensive testimony Greenwood relied on for his self-defense claim, and this court may not substitute its own view of the witnesses' credibility for that of the jury's. *See id.* at 607. Viewing the evidence in the light most favorable to the verdict and deferring to the jury's credibility assessment, any rational trier of fact could have found against Greenwood on the self-defense issue and found the State proved

all the essential elements of murder beyond a reasonable doubt. *See id.* at 608; *see also Capetillo*, 2020 WL 5802959, at *3.

CONCLUSION

The judgment is affirmed.

Luz Elena D. Chapa, Justice

Do Not Publish